Filing # 114554222 E-Filed 10/07/2020 09:00:10 AM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

TARPON TRANSPORTATION SERVICES,
INC., a Florida corporation,

    Plaintiff,

v.

TOTAL QUALITY LOGISTICS, LLC, an
Ohio limited liability company,

    Defendant.
_____/

CASE NO:

DIVISION: L

## COMPLAINT

Plaintiff, Tarpon Transportation Services, Inc. ("**Tarpon**" or "**Plaintiff**"), by and through undersigned counsel, sues defendant Total Quality Logistics, LLC ("**TQL**" or "**Defendant**") and seeks declaratory relief, injunctive relief, and damages against Defendant. Tarpon seeks a declaration from this Court that the "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement" (the "**Non-Compete Agreement**") between TQL and its former employee, David Minnis ("**Minnis**"), terminated before Tarpon entered an independent contractor relationship with Doc M. LLC, which is wholly owned and operated by Minnis and corresponding injunctive relief to enjoin TQL from taking further actions to attempt to enforce the Non-Compete Agreement, or alternatively that the restrictive covenant included in the Non-Compete Agreement is unenforceable. TQL also brings claims against TQL for intentional interference with the Tarpon's business relationships with its independent contractor. In support, Tarpon alleges as follows:

## INTRODUCTION

1. Tarpon is a Florida corporation headquartered in Tampa, Florida. Tarpon brokers freight, meaning that it matches carriers with people or companies who have goods that need to be shipped. Tarpon's business prospects are concentrated in Florida and the Southeast region, and Tarpon's existing customer base is almost exclusively located in Florida or the Southeast. While the freight shipping business involves interstate commerce, Tarpon's activities in the transportation industry are largely tied to its regional footprint.

2. More than two years ago, Tarpon entered an independent contractor relationship with a limited liability company, Doc M. LLC, which is owned and operated by its manager, Minnis. Minnis was previously employed by Defendant for less than a year, but has not been employed by Defendant for more than four years, as he was terminated on July 22, 2016.

3. TQL, one of the largest freight brokerage firms in North America, has a well-established record of seeking to ruthlessly enforce its employment and non-compete agreements, which contain onerous and absurd terms that potentially appear to presume that any former employee's employment relationship with a "competing business" (which could incorporate almost any business in the freight transportation industry) would necessarily result in the employee misappropriating alleged trade secrets.

4. This case arises from the Defendant's belated efforts to attempt to enforce the Non-Compete Agreement against Tarpon, who is not even a party to employment agreement between Minnis and TQL, and to disrupt Tarpon's valuable business relationship with one of its independent contractors.

## PARTIES, JURISDICTION, AND VENUE

5. Tarpon is a corporation duly organized under the laws of the state of Florida, with its principal place of business located at 2710 W. Virginia Avenue, Tampa, FL 33607-6328.

6. TQL is an Ohio limited liability company registered under the laws of the state of Florida with its principal place of business located at 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245.

7. This Court has subject matter jurisdiction pursuant to section 26.012, Florida Statutes, because the value of the matter in controversy exceeds $15,000, exclusive of interest, attorneys' fees, and costs, and because this is an action for injunctive relief.

8. Moreover, this Court has jurisdiction over Defendant pursuant to section 48.193, Florida Statutes, and applicable decisional law because, among other things, Defendant (a) committed tortious acts within Florida, as described, in part, below, and (b) engaged in substantial and not isolated activities in this state.

9. Venue is proper in Hillsborough County, Florida pursuant to section 47.051, Florida Statutes, because, among other things, (a) TQL is registered to do business in Florida and has an office for transaction of its customary business and had agents or other representatives located in the greater Tampa Bay area; (b) Tarpon's only office is located in Tampa; (c) Doc M. LLC's principal place of business is located in Hillsborough County and renders services to Tarpon in Tampa; and (d) the causes of action set forth below accrued in this county. TQL intentionally committed torts in Hillsborough County.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

10. More than five years ago, Minnis accepted a position with TQL in August 2015. In connection with his employment with TQL, upon information and belief, Minnis executed a Non-Compete Agreement. A copy of the Non-Compete Agreement is attached as Exhibit "A".

11. Critically, the Non-Compete Agreement includes the following restrictive covenant (the "**Restrictive Covenant**"):

> **Restrictive Covenant.** During employment with the Company, and for a period of one (1) year immediately following termination of his employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, the Employee shall not (directly or indirectly, either as an individual on his own account or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise) contact, solicit or accept business from, render any services, give assistance to or accept any compensation from any Customer or customer prospect of the company. A customer prospect is any business, company, individual, partnership or entity, including former Customers, with which the Company or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of the Company within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.

12. Minnis' employment with TQL terminated on July 22, 2016, and the one year period under the Non-Compete Agreement ended on July 22, 2017.

13. Some twenty-one months after Minnis left TQL, on or about March 12, 2018, Tarpon engaged Doc M. LLC as an independent contractor.

14. Minnis is the sole member and manager of Doc M. LLC.

15. Even though the Non-Compete Agreement has terminated, neither Minnis nor his LLC has contacted any of TQL's former customers since the inception of the relationship with Tarpon. Rather, TQL has approached several of Tarpon's long time customers in an effort to solicit their business since Doc M. LLC began rendering services to Tarpon as an independent contractor.

4

16. As early as April 2018, TQL was aware of Tarpon's independent contractor relationship with Minnis.

17. Indeed, TQL brought an action against Tarpon in the Court of Common Pleas for Clermont County, Ohio, on or about April 23, 2010. Thereafter, Tarpon removed the action to the United States District Court for the Southern District of Ohio, Western Division.

18. On or about September 16, 2019, the Ohio district court entered and granted Tarpon's motion to dismiss based on a lack of personal jurisdiction.

19. For nearly a year, TQL took no further action to pursue Tarpon.

20. Without notice to Tarpon, in November 2019, TQL obtained from an Ohio state court a default judgment against Minnis, which in essence concluded that Minnis violated the Restrictive Covenant.

21. On or about September 29, 2020, TQL has purportedly filed (but not served) a motion for order to show cause to attempt to enforce the judgment against Tarpon as well.

## COUNT I
## DECLARATORY RELIEF

22. Tarpon realleges and incorporates by reference its allegations set forth in paragraphs 1 through 21 above.

23. This is an action pursuant to Chapter 86, Florida Statutes, for declaratory relief.

24. Tarpon entered an independent contractor relationship with Doc M. LLC on or about March 12, 2018, long after the expiration of the Restrictive Covenant.

25. TQL is now trying to enforce the Restrictive Covenant more than four years after Minnis' employment with TQL terminated.

26. With respect to the Restrictive Covenant, there is a bonafide dispute between Tarpon and TQL concerning the validity of, enforceability against, and application to Doc M. LLC and Tarpon.

27. There is a justiciable question as to whether the Restrictive Covenant is enforceable against Tarpon or Doc M. LLC and whether the Restrictive Covenant expired before Tarpon initiated any relationship with Doc M. LLC or Minnis.

WHEREFORE, Tarpon respectfully requests the following relief:

a. Judgment declaring that the Restrictive Covenant terminated prior to Tarpon entering an independent contractor relationship with Doc M. LLC;

b. Judgment declaring that Minnis and Doc M. LLC did not violate the Restrictive Covenant by engaging in an independent contractor relationship with Tarpon;

c. Alternatively, judgment declaring that the Restrictive Covenant is unenforceable;

d. Judgment against Defendant for compensatory damages, costs, interest, and attorney fees; and

e. Such additional relief as is necessary and just to protect Tarpon's rights and interests.

**COUNT II**
**Tortious Interference with a Business Relationship**
**(For Injunctive Relief and Damages)**

28. Tarpon realleges and incorporates by reference its allegations set forth in paragraphs 1 through 21 above.

29. Tarpon has a contractual relationship with Doc M. LLC.

30. Defendant had knowledge of Tarpon's contractual relationship with Doc M. LLC.

31. Defendant intentionally and unjustifiably interfered with Tarpon's contractual relationship with Doc M. LLC, by demanding that Tarpon terminate its relationship with Doc M. LLC, among other things.

32. Defendant's interference was willful and engaged with the purpose of injuring Tarpon.

33. Tarpon has been damaged as a direct and proximate result of Defendant's conduct. Tarpon has been irreparably harmed and suffered damages for which it has no adequate remedy at law.

WHEREFORE, Tarpon respectfully requests the following relief:

a. A temporary injunction enjoining and restraining Defendant from taking any actions to enforce the Restrictive Covenant against Minnis, Doc M. LLC, and/or Tarpon;

b. A permanent injunction enjoining and restraining enjoining and restraining Defendant from taking any actions to enforce the Restrictive Covenant against Minnis, Doc M. LLC, and/or Tarpon;

c. Judgment against Defendant for compensatory damages, costs, interest, and attorney fees; and

d. Such additional relief as is necessary to protect Tarpon's rights and interests.

## COUNT III
### Tortious Interference with Employment Relationships
### (For Damages)

34. Tarpon realleges and incorporates by reference its allegations set forth in paragraphs 1 through 21 above.

35. Tarpon has an advantageous relationship with Doc M. LLC under which Tarpon had legal rights.

7

36. TQL had knowledge of Tarpon's relationship with Doc M. LLC.

37. TQL unjustifiably and intentionally interfered with Tarpon's relationship with Doc M. LLC without justification.

38. Specifically, without notice to Tarpon, TQL obtained a judgment against Minnis and is now attempting to enforce it against Tarpon, unless Tarpon is willing to terminate its relationship with Doc M. LLC.

39. TQL's interference was willful and engaged with the purpose of injuring Tarpon.

40. Tarpon has been damaged as a direct and proximate result of TQL's conduct. Tarpon has been irreparably harmed and suffered damages for which it has no adequate remedy at law.

WHEREFORE, Tarpon respectfully requests the following relief:

a. Judgment against TQL for compensatory damages, costs, interest, and attorney fees; and

b. Such additional relief as is necessary to protect Tarpon's rights and interests.

Dated: October 7, 2020

Respectfully submitted,

/s/ Kathleen L. DiSanto
Kathleen L. DiSanto, FBN 58512
**BUSH ROSS, P.A.**
1801 North Highland Avenue
Tampa, FL 33602
813-224-9255
813-223-9620
Primary: kdisanto@bushross.com
Secondary: ksprehn@bushross.com

# EXHIBIT "A"

## TOTAL QUALITY LOGISTICS, LLC

## CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT

### Florida

THIS CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT ("the Agreement"), is made and entered into on _August 17_, 20_15_, by and between TOTAL QUALITY LOGISTICS, LLC ("TQL" or "the Company") and _David Minnis_ ("the Employee").

### RECITALS:

**WHEREAS**, the Company is an Ohio Limited Liability Company that operates in the State of Florida. The Company is engaged in providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary corporations, all related entities, and its successors and assigns;

**WHEREAS**, The Company is unique within the organizations providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). The Company has spent extensive time developing relationships with Customers, Carriers, suppliers and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Carriers, suppliers, contact information, lanes, pricing, sales strategy, service and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns at and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL;

**WHEREAS**, TQL develops and maintains confidential, proprietary information (hereinafter referred to as "Confidential Information"), as defined in this Agreement;

**WHEREAS**, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential, proprietary information by TQL;

**WHEREAS**, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships

FL                                    1



on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

**WHEREAS,** Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

**WHEREAS,** Employee acknowledges that TQL's Customer and Carrier lists, other information about TQL's Customers and Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the shipping, third-party logistics, freight brokerage, truck brokerage, and supply-chain management services industry;

**WHEREAS,** in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties;

**WHEREAS,** TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and is bound by it;

**WHEREAS,** the Company has a strong and legitimate business interest in preserving and protecting its investments including, but not limited to, its specialized training, its Confidential Information, its trade secrets and its good will; and

**WHEREAS,** the Company desires to preserve and protect its legitimate business interests and Confidential Information further by prohibiting competitive activities of the Employee during his or her employment with the Company and by preventing unfair and unlawful competitive activities by Employee following termination of his or her employment with the Company.

**NOW THEREFORE,** in consideration of the employment or continued employment by the Company of the Employee and other good and valuable consideration the receipt and sufficiency of which is acknowledged by the Employee, the Company and the Employee agree:

1. Recitals. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth herein.

2. Employment. Employer employs Employee as an employee at will, and nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time. Employee agrees to undertake and assume the responsibility for performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time from

FL                                    2

time to time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including, but not limited to, any salary, other cash compensation and benefits.

3. <u>Confidential Information – Defined</u>. The Employee recognizes, acknowledges and agrees that TQL develops and maintains confidential, proprietary information (referred to herein as "Confidential Information"), including but not limited to, its operating policies and procedures; computer data bases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Carriers, financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Carriers, and vendors; pricing, marketing and sales lists and strategies; Customer lists and Carrier lists including contact names, addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information includes all information developed, acquired and maintained by Employee in the course of his or her employment with the Company as it may exist from time to time, and whether or not it is maintained on the Employee's personal computer, laptop, or other equipment personally owned by the Employee, and is the property of the Company. Further, Confidential Information may be protected by patents, copyrights, or other means of protection; and further includes, without limitation:

(a) All documents describing, and all information and knowledge regarding, procedures or methods employed by the Company in soliciting, procuring, and handling the Company's customers and business, including working and billing procedures;

(b) All information acquired by the Company relating to prospective and current business transactions and arrangements;

(c) All market analyses and/or demographic market analyses and/or demographic information or studies of the current and/or potential markets of interest to the Company;

(d) All understandings between or among the Company and other persons;

(e) All documents provided to the Company in confidence by third parties;

(f) All legal documents and correspondence concerning the Company;

(g) All opinions, decisions, rulings, and audits of governmental agencies relating to the Company;

(h) All files concerning the Company's customers and prospective customers, and the contents of such files; and

(i) All other information specifically designated "Confidential" by the Company.

4. <u>Confidential Information – Admissions and Agreements</u>. The Employee admits and agrees that such Confidential Information is a valuable, special and unique asset of the Company's business that gives the Company advantage over its actual and potential competitors, and the Employee further admits and agrees that:

(a) The Company has implemented such practices and measures as are reasonably necessary to preserve and to protect the confidentiality of such Confidential Information;

(b) The Employee has access to such Confidential Information;

(c) The Employee has been instructed about, and knows and understands the value and importance of such Confidential Information;

(d) The Employee, by reason of the trust relationship arising between the Company and him or her, owes the Company a fiduciary duty to preserve and protect such Confidential Information from all unauthorized disclosure or unauthorized use;

(e) Such Confidential Information constitutes "trade secrets";

(f) Unauthorized disclosure or unauthorized use of such Confidential Information would irreparably injure the Company;

(g) The Employee agrees to immediately assemble, produce and return all of the Company's Confidential Information in the Employee's possession at any time during the course of his or her employment with the Company upon the request or demand of the Company; and

(h) The Employee agrees to return all of the Company's Confidential Information and to delete the Company's Confidential Information from any personal computer (or similar device) of Employee upon the termination of Employee's employment with the Company. The Employee further consents to permit the Company

to inspect and delete all of the Company's Confidential Information from the Employee's personal computers, laptops and other equipment including any personal computer maintained by the Employee at his or her home or elsewhere. Upon Company's request, the Employee agrees to execute a written statement under oath swearing that all of the Confidential Information of the Company that the Employee previously maintained upon his or her personal computer, if any, has been deleted. The Employee further agrees that the Company shall have no obligation to pay any further compensation or remuneration to the Employee unless and until such time as the Employee provides his or her written statement under oath as contemplated by this Paragraph.

5. <u>Confidential Information – Prohibited Acts</u>. The Employee understands and agrees that all Confidential Information is to be preserved and protected, is not to be disclosed or made available, directly or indirectly, to third persons for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company, and is not to be used, directly or indirectly, for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company; specifically, and without modifying or limiting the Agreement, the Employee understands and agrees that, except in the ordinary course of conducting business for the Company, no Confidential Information, nor any part of it, either in original form or in duplicating or copied form, is to be (i) removed at any time from the premises of the Company, or (ii) disclosed or made available, verbally, by electronic transmission, or by any other form or manner of communication, to any person, firm, corporation, association, or any other legal entity for any reason or purposes whatsoever, without prior written authorization of an executive officer of the Company.

Employee agrees that Employee's engaging in any form of employment relationship with a Competing Business, as defined herein would necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) the term "Carrier" is any over-the-road shipper, motor carrier, trucker, or hauling business or otherwise defined in 49 USC §13102(3) that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) the term "Competing Business" is any person, firm, corporation, or entity that is engaged in third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) the term "solicit" includes but is not limited to, any efforts in any form, intended to take business away from, intercept or interfere with the business of TQL, including relationships with TQL and its

FL                                    5

employees, Customers, Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Carrier.

6. <u>Confidential Information – Continuing Obligations</u>. The Employee understands and agrees that his obligations under this Agreement, specifically including the obligations to preserve and protect and not to disclose (or make available) to third parties consistent with applicable law, continue indefinitely and do not, under any circumstances or for any reason, whether voluntarily or involuntarily, specifically including wrongful discharge, cease upon termination of employment; and that, in the event of termination of the Employee's employment for any reason, specifically including wrongful discharge, such Confidential Information shall remain the sole property of the Company and shall be left in its entirety in the undisputed possession and control of the Company after such termination. Employee agrees to inform all prospective or future employers of the Employee's obligations under the provisions of this Agreement.

7. <u>Confidential Information – Proprietary Interest</u>. The Employee understands and agrees that all such Confidential Information is and shall remain, at all times, the sole property of the Company; that he or she obtains no proprietary interest in any Confidential Information developed or acquired in the course of his employment with the Company; and that it shall be no defense to an action brought to enforce the confidentiality provisions of this Agreement that the Employee developed or acquired, in whole or in part, the Confidential Information disclosed or used without authorization.

8. <u>Confidential Information – Protected Whether Information of Parent or Subsidiaries</u>. That Employee recognizes, acknowledges, and agrees that this Agreement is specifically and expressly intended to protect, and does specifically and expressly protect all Confidential Information of the Company, whether in the possession, custody or control of the Company, its employees, officers, agents or any other affiliated, parent or subsidiary company.

9. <u>Restrictive Covenant</u>. During employment with the Company, and for a period of one (1) year immediately following termination of his employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, the Employee shall not (directly or indirectly, either as an individual on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise) contact, solicit or accept business from, render any services, give assistance to or accept any compensation from any Customer or customer prospect of the Company. A customer prospect is any business, company, individual, partnership or entity, including former Customers, with which the Company or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of the Company within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.

FL 6

Further, Employee hereby agrees that he or she shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of the Company, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on his own account, or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, for a period of one (1) year after the date of the termination of Employee's employment with the Company.

This Agreement on the part of the Employee, is given and made by the Employee to induce the Company to employ or continue to employ the Employee for a position of trust and confidence and to enter into this Agreement with the Employee, and the Employee hereby acknowledges the sufficiency of the consideration of this Restrictive Covenant.

It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

This Restrictive Covenant shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant.

The refusal or failure of the Company to enforce this Restrictive Covenant against any other employee or ex-employee, for any reason, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant, nor shall it give rise to any claim or cause of action by such employee or ex-employee against the Company.

If any portion of this Restrictive Covenant is held by a Court of competent jurisdiction to be unreasonable, arbitrary, against public policy for any reason, or invalid for any reason, the Restrictive Covenant shall be considered divisible, as to time, to geographical area, and to restrictive scope; each month of the specified period shall be deemed a separate period, each square mile within the restricted territory shall be deemed a separate geographical area, and each customer and customer prospect shall be deemed a separate area of restriction so that the lesser period or area of restriction shall remain effective so long as such lesser restriction is not unreasonable, arbitrary, or against public policy for any reason. The Company and the Employee agree that, if a Court of competent jurisdiction should determine the specified period or the scope of the restriction to be unreasonable, arbitrary or against public policy for any reason, a lesser period or restrictive scope that is determined to be reasonable non-arbitrary, and not against public policy for any reason, may be enforced by the Company against the Employee.

10. <u>Confidential Information – Remedies</u>. If an action should have to be brought by the Company against the Employee to enforce the provisions of this

Agreement, the Employee recognizes, acknowledges and agrees that the Company is entitled to all civil remedies including without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from any unauthorized disclosure or use of any Confidential Information, in whole or in part, and from rendering any service to any person, firm, corporation, association, or other legal entity to whom or to which such Confidential Information, in whole or in part, has been disclosed or is threatened to be disclosed; and

(b) Actual damages, attorneys' fees in the trial and appellate courts, costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses; and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursuing any other legal or equitable remedies available for breach or threatened breach of the provisions of this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the provisions of this Agreement.

11. <u>Restrictive Covenant – Remedies</u>. The Company and the Employee agree that, in the event of a breach by the Employee of the Restrictive Covenant set forth above, such a breach would irreparably injure the Company and would leave the Company with no adequate remedy at law, and the Company and the Employee further agree that, if an action should have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the Company shall be entitled to all available civil remedies under Ohio and/or Florida statutes and case law. The remedies available to Employer against Employee shall further include, without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from violating, directly or indirectly, either as an individual, on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, the competitive restriction of Paragraph 9 above; and

(b) Actual damages, attorneys' fees in the trial, appellate courts; costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses, and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursing any other legal or equitable remedies available to it for breach or threatened breach of the Restrictive Covenant, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the Restrictive Covenant.

Should an action have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the period of restriction shall be deemed to begin running on the date of entry of an Order granting the Company preliminary injunctive relief, and shall continue uninterrupted for the next succeeding one (1) year; the Employee acknowledges and agrees that the intent and purpose of the Restrictive Covenant is to preclude him or her from competing with the Company for a full one (1) year period, and that such purpose and effect would be frustrated by measuring the period of restriction from the date of termination of employment where the Employee failed to honor the Restrictive Covenant, until directed to do so by Court Order.

12. <u>Property Rights and Assignment</u>. Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

13. <u>Consideration</u>. The Employee expressly acknowledges and agrees that the execution by the Company of this Agreement and the obligations of the Company under this Agreement constitute full, adequate, and sufficient consideration to the Employee from the Company for the duties, obligations, and covenants of the Employee under this Agreement, including, by way of illustration and not by way of limitation, the agreements, covenants, and obligations of the Employee under Paragraphs 4, 5, 6, 7, 8, 9 and 12 of this Agreement. The Company expressly acknowledges and agrees similarly with respect to the consideration received by it from the Employee under this Agreement.

14. <u>Personnel Policies</u>. Employee agrees to abide by TQL's rules, regulations, policies and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this agreement may be made only by an express written agreement between Employee and TQL.

15. <u>Notices</u>. Any and all notices that shall be given pursuant to this Agreement shall be in writing, shall be either actually delivered or sent by United States

mail, return receipt requested, and shall be addressed to the parties at the addresses shown on the signature page of this Agreement.

16. <u>Consent to Jurisdiction and Venue – Waiver of Jury Trial</u>. The Employee hereby consents to jurisdiction and venue for any action brought by the Company arising out of a breach or threatened breach of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio or the United States District Court located in the jurisdiction where the office of your employment is located, and the Employee hereby agrees that any controversy which may arise under this Agreement or the relationship established by this Agreement would involve complicated and difficult factual and legal issues and that, therefore, any action brought by the Company against the Employee or brought by the Employee, alone or in combination with others, against the Company, whether arising out of this Employment Agreement or otherwise, shall be determined by a judge sitting without a jury.

17. <u>Acknowledgment</u>. The Employee hereby acknowledges that he or she has been provided with a copy of this Agreement for review prior to signing it, that he or she has been given the opportunity to have this Agreement reviewed by his or her own attorney prior to signing it, that he or she understands the purposes and effects of this Agreement, and that he or she has been given a signed copy of this Agreement for his or her own records.

18. <u>Waiver of Breach</u>. The waiver by the Company of a breach or threatened breach of any provision of this Agreement by the Employee shall not be construed as a waiver of any subsequent breach of the Employee.

19. <u>Assignability</u>. This Agreement shall be binding upon and inure to the benefit of Employer, its successors, and assigns, and shall be binding upon and inure to the benefit of Employee, his/her personal representatives, estate, heirs, and designated beneficiaries.

20. <u>Rules of Construction</u>.

    (a) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Company and the Employee pertaining to the subject matters hereof, and it supersedes all negotiations, preliminary agreements, and all prior and contemporaneous discussions and understandings of the parties in connection with the subject matters hereof. Except as otherwise provided, no covenant, representation, or condition not expressed in either this Agreement or an amendment hereto made and executed in accordance with the provisions of Subparagraph (b) of this paragraph shall be binding upon the parties hereto or shall affect or be effective to interpret, change, restrict or terminate the provisions of this Agreement;

    (b) <u>Amendments</u>. No change, modification, or termination of any of the terms, provisions or conditions of this Agreement shall be effective unless made in writing and signed or initialed by all parties to this Agreement;

(c) <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the statutory and decisional law of the State of Ohio first, and Florida law if necessary;

(d) <u>Severability</u>. If any paragraph, subparagraph or provision of this Agreement, or the application of such paragraph, subparagraph or provision is held invalid, the remainder of the agreement, and the application of such paragraph, subparagraph, or provision to persons or circumstances other than those with respect to which it is held invalid, shall not be affected thereby;

(e) <u>Headings and Captions</u>. The titles and captions of paragraphs and subparagraphs contained in this Agreement are provided for convenience or reference only, and they shall not be considered a part of this Agreement; such titles or captions are not intended to define, limit, extend, explain, or describe the scope or extent of this Agreement or any of its terms, provisions, representations, warranties, conditions, etc., in any manner or in any way whatsoever.

(f) <u>Gender and Number</u>. All pronouns shall be deemed to refer to the masculine or feminine, and to the singular or plural, as the identity of the person or persons may require; and

(g) <u>Continuance of Agreement</u>. The rights, responsibilities and duties of the Company and the Employee, and the covenants and agreements contained in this Agreement shall survive the execution of this Agreement, shall continue to bind the parties to this Agreement, shall continue in full force and effect until each and every obligation of the parties pursuant to this Agreement shall have been performed, and shall be binding upon the successors and assigns of the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above-written.

WITNESSES:

_[signature]_
LINDSAY ELLIOTT

_____

TOTAL QUALITY LOGISTICS, LLC
"Company"

By: _[signature]_
Print: DENNIS FERGUSON
Address: 1001 S HARBOUR ISLAND BLVD.
TAMPA, FL 33602

"Employee"

_[signature]_
Print: Dave Minni
Address: 17730 Jamestown Way
Lutz, FL 33558

FL                    11